**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| I HEALTH AND LIFE INSURANCE SERVICES, | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:25-cv-01315-AOB-T |
| v. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**SECOND AMENDED COMPLAINT**

Pursuant to RCFC 15(a)(2) and the Court's Opinion and Order of July 23, 2026 (ECF 30) granting leave to amend, I Health and Life Insurance Services ("Plaintiff") files this Second Amended Complaint against the United States of America ("Defendant") for a refund of the Employee Retention Credit for the third quarter of 2020. A redlined version comparing this pleading to Plaintiff's First Amended Complaint accompanies this filing.

**THE PARTIES**

1. I Health and Life Insurance Services is a California corporation with its principal place of business at 1131 E. Hogan Avenue, Fresno, California 93730. Plaintiff operates under the trade name "I Life and Health Insurance Services."

2. The United States of America is the proper defendant because this Second Amended Complaint seeks refund of taxes paid to (and refundable credits owed from) the Internal Revenue Service ("IRS").

3. Plaintiff has not initiated any other lawsuits in state or federal court dealing with the same or similar facts as this action.

4. A statement required under RCFC 9(m)(2)(B) is attached as Exhibit A.

Style Definition ... [20]
Style Definition ... [19]
Style Definition ... [18]
Style Definition ... [17]
Style Definition ... [16]
Style Definition ... [15]
Style Definition ... [14]
Style Definition ... [13]
Style Definition ... [12]
Style Definition ... [11]
Style Definition ... [10]
Style Definition ... [9]
Style Definition ... [8]
Style Definition ... [7]
Style Definition ... [6]
Style Definition ... [5]
Style Definition ... [4]
Style Definition ... [3]
Style Definition ... [2]
Style Definition ... [1]
Formatted ... [21]
Formatted ... [23]
Formatted ... [22]
Formatted ... [24]
Formatted ... [25]
Formatted ... [26]
Formatted ... [27]
Formatted ... [28]
Formatted ... [29]
Formatted ... [30]
Deleted: FIRST
Formatted ... [32]
Formatted ... [31]
Deleted: Rule of the Court of Federal Claims ("
Formatted ... [33]
Deleted: ("
Deleted: ")
Deleted: First
Formatted ... [34]
Formatted ... [35]
Formatted ... [36]
Formatted ... [37]
Formatted ... [38]
Deleted: "
Deleted: ."
Formatted ... [39]
Formatted ... [40]
Deleted: ("IRS"), a political subdivision of the Unite ... [41]
Deleted: The
Formatted ... [42]
Deleted: .
Formatted ... [43]
Formatted ... [44]

Formatted: Font: 12 pt
Formatted: Header, Line spacing: single

## JURISDICTION

Formatted: Font: Not Bold

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1346(a)(1) and 28 U.S.C. § 1491.

Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by

## LEGAL BACKGROUND

### Federal Employment Taxes

6. Plaintiff is claiming a refund of Form 941 employment taxes ("Form 941 taxes") and the refundable Employee Retention Credit ("ERC") for the quarter ended September 30, 2020, because its business was partially suspended by government orders that limited commerce, travel, or group meetings.

7. Employers are required by law to withhold federal income taxes and Federal Insurance Contributions Act ("FICA") taxes from their employees' wages, remit these withholdings, and report them to the IRS on tax Form 941. The portion of Form 941 taxes attributable to the employees' withholdings is often referred to as the "Trust Fund" portion.

8. Employers are also responsible for paying FICA taxes that they owe, often referred to as the "employer portion," and reporting such taxes to the IRS on Form 941. 26 U.S.C §§ 3102 and 3111.

9. Employers are usually obligated to file with the IRS the Form 941 quarterly. 26 U.S.C § 6011; 26 C.F.R. § 31.6071 (a)-1.

### Employee Retention Credit

10. In response to the COVID-19 pandemic, Congress passed the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Pub. L. 116-136 (Mar. 27, 2020). Section 2301 of the CARES Act provided for the ERC to be issued to eligible employers on qualified wages paid to their employees. Pub. L. 116-136, § 2301. The ERC program was amended and

Formatted: Centered
Formatted: Font: 11 pt

Formatted: Font: 12 pt

Formatted: Header, Line spacing: single

extended under the Consolidated Appropriations Act of 2021, Pub. L. 116-260, § 206 (Dec. 27, 2020), and the American Rescue Plan Act of 2021, Pub. L. 117-2, § 3134 (Mar. 11, 2021), and terminated under the Infrastructure, Investment and Jobs Act, Pub. L. 117-58, § 80604, (Nov. 15, 2021). *See also* 26 U.S.C. § 3134 (codifying § 2301 of the CARES Act).

Deleted: section

11. A business that is an eligible employer that pays qualified wages after March 12, 2020, and through December 31, 2021, is entitled to claim the ERC against its Form 941 taxes on an amended Form 941 return for that quarter, if the same was not claimed on the original Form 941. *See* CARES Act § 2301(a) & (b)(1) (2020 claims), Consolidated Appropriations Act, 2021, Div. EE, 207(e)(1) (amending § 2301 of CARES Act to apply through Q2 2021), American Rescue Plan Act of 2021, § 9651(a) (Q3 and Q4 2021 and codifying ERC).

12. Under § 2301(b)(3) of the CARES Act, if the amount of the credit exceeds the amount of Form 941 taxes for any applicable quarter, then the excess is treated as an overpayment and refunded to the employer. *See* 26 U.S.C. § 3134(b)(3).

Deleted: section

Formatted: Not Expanded by / Condensed by

**General Qualifying Requirements**

***Employer Eligibility***

13. An "eligible employer" is one that carried on a trade or business during calendar years 2020 and 2021 and, with respect to specific calendar quarters, experienced one of the following:

a. Its operations were fully or partially suspended due to orders issued by a governing authority in response to COVID-19 ("Full or Partial Suspension Test") that limited commerce, travel, or group meetings; or

b. The business experienced a significant decline in gross receipts ("Gross Receipts

Formatted: Centered

Formatted: Font: 11 pt

Formatted: Font: 12 pt
Formatted: Header, Line spacing: single

> Test") for any calendar quarter of 2020 and/or the first three quarters of 2021[1] compared to the corresponding quarter of 2019.

26 U.S.C. § 3134(c)(2).

14. To claim the credit as a small eligible employer for quarters in the taxable year 2021, the employer must have averaged no more than 500 employees in 2019. *See* 26 U.S.C. § 3134(c)(3).

***Qualified Wages***

15. For the purposes of the ERC, "qualified wages" are the wages paid by an eligible employer to their employees, to include expenses the eligible employer paid to provide and maintain a group health plan, but only to the extent that the amounts are excluded from the gross income of the employees. *See* 26 U.S.C. §§ 3134(c)(3), (c)(4) (A), (c)(4)(B).

***Calculating the Credit***

16. For quarters in 2020, the employee retention credit is limited to 50% of qualified wages that an eligible employer pays to an employee in a calendar quarter. 26 U.S.C. § 3134(b)(1). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee for the entire calendar year of 2020. 26 U.S.C. § 3134(b)(1).

17. For quarters in 2021, the employee retention credit is limited to 70% of qualified wages that an eligible employer pays in a calendar quarter. 26 U.S.C. § 3431(a). The maximum amount of qualified wages that the credit can be claimed against is $10,000 per employee per quarter in 2021. 26 U.S.C. § 3134(b)(1).

[1] A business may be eligible to receive an ERC for the fourth quarter 2021 if it qualifies as a "recovery startup business." *See* 26 U.S.C. § 3134(c)(2)(A)(ii)(III). Plaintiff does not qualify as such and thus does not seek an ERC for this quarter.

Formatted: Centered
Formatted: Font: 11 pt

## FACTUAL BACKGROUND

### Plaintiff's Business and Its Component Operations

18. Plaintiff assists customers with finding life and health insurance plans that meet their needs. Plaintiff operates call centers in Fresno, California and Carlsbad, California (in San Diego County).

19. Before March 2020, Plaintiff conducted its business through distinct in-person operational components at those facilities: (a) production call handling by licensed agents at fixed workstations on open call floors; (b) in-person training and onboarding of new agents; (c) live floor supervision and side-by-side coaching of agents on active sales calls; and (d) on-site customer-service call handling. Each component is described, and its cessation pleaded, separately below.

20. Plaintiff's customer service representatives sat in close quarters in open-air cubicles and relied on location-specific technology tools, including the Five9 hosted call-center telephony platform through which inbound sales calls were queued, routed, timed, and recorded, and commercial high-speed internet available only at the call centers.

21. Plaintiff is solely owned by Raymond Giudici.

22. Plaintiff had on average less than 100 full-time employees during calendar year 2019.

23. Plaintiff paid qualified wages to its employees in calendar years 2020 and 2021; is not a party to any employee leasing arrangement and did not otherwise lease employees; and is not part of an affiliated service group within the meaning of 26 U.S.C. § 414(m).

### The Relevant Government Orders

24. Between March 2020 and September 2021, the State of California, Fresno County,

Formatted: Font: 12 pt
Formatted: Header, Line spacing: single
Formatted: No underline, Underline color: Auto
Formatted: Font: Not Bold, No underline, Underline color: Auto, Not Expanded by / Condensed by
Formatted: Don't keep with next
Deleted: During the COVID-19 pandemic,
Deleted: -
Formatted: Not Expanded by / Condensed by
Deleted: .¶
Plaintiff
Formatted: Not Expanded by / Condensed by
Deleted: .¶
Plaintiff
Formatted: Not Expanded by / Condensed by
Deleted: a
Formatted: Not Expanded by / Condensed by
Deleted: Governmental
Formatted: Normal, Don't keep with next, Tab stops: Not at 1.68"
Deleted: 12,
Formatted: Centered
Formatted: Font: 11 pt

and San Diego County issued orders limiting commerce, travel, and group meetings in response to COVID-19 ("Relevant Governmental Orders"). The orders operative during the third quarter of 2020 are pleaded in this section; orders governing later periods are pleaded separately below under "Subsequent Periods."

25. Each Relevant Governmental Order pleaded below carried enforcement authority on its face; the enforcement provisions are pleaded order-by-order from each instrument's own recitals.

***The Statewide Orders***

26. On March 12, 2020, Governor Gavin Newsom issued Executive Order N-25-20, directing that "[a]ll residents are to heed any orders and guidance of state and local public health officials, including but not limited to the imposition of social distancing measures, to control the spread of COVID-19"; on March 19, 2020, by Executive Order N-33-20, the Governor ordered "all individuals living in the State of California to stay home . . . except as needed to maintain continuity of operations of the federal critical infrastructure" sectors. Each executive order issued under the California Emergency Services Act and cites California Government Code § 8567, under which the Governor's orders "shall have the force and effect of law." Executive Order N-33-20 issued "in particular" under Cal. Gov't Code §§ 8567, 8627, and 8665; directed the Office of Emergency Services to "take necessary steps to ensure compliance with this Order"; and recited on its face: "This Order shall be enforceable pursuant to California law, including, but not limited to, Cal. Gov't Code § 8665." Under Cal. Gov't Code § 8665, refusal or willful neglect to obey any lawful order issued under the Emergency Services Act is a misdemeanor punishable by a fine of up to $1,000, imprisonment not exceeding six months, or both.

27. On May 4, 2020, by Executive Order N-60-20 — likewise issued under Cal. Gov't

**Formatted:** Font: 12 pt

**Formatted:** Header, Line spacing: single

**Deleted:** , as well as their respective subdivisions,

**Deleted:** that limited

**Deleted:** ("

**Deleted:** Orders") that more than nominally reduced Plaintiff's capacity to render its services, creating a partial suspension of Plaintiff's business operations

**Formatted:** Font color: Auto

**Deleted:** <#>Failure to comply with *any* of the Orders issued by any Public Health Officer in California was then (and remains) a misdemeanor punishable by fine, imprisonment, or both. *See* Calif. Health & Safety Code § 120295; Calif. Penal Code §§ 69, 148(a)(1).¶
*Relevant California Governmental*

**Formatted:** Font: Bold

**Formatted:** Centered, Indent: Left: 0"

**Deleted:** California

**Deleted:** all

**Deleted:** or

**Deleted:** from

**Deleted:** . *See* Calif. Exec. Ord. N-25-20 (May 12, 2020). This order remained in effect until June 30, 2021.¶
On…

**Deleted:** via

**Deleted:** Newsom

**Deleted:** ."

**Deleted:** via

**Deleted:** ,

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Formatted:** Centered

**Formatted:** Font: 11 pt

Code § 8567 and carrying the force and effect of law — the Governor directed the State Public Health Officer to establish a risk-based framework for reopening the economy, and preserved "the existing authority of local health officers to establish and implement public health measures . . . more restrictive than" the statewide measures.

28. On May 7, 2020, the Acting State Public Health Officer issued an order allowing certain lower-risk businesses to gradually reopen subject to mandatory modifications. The order issued under California Health and Safety Code §§ 131080 and 120175, which direct the Department of Public Health to "control and regulate" local health authorities' actions when the public health is menaced and direct health officers to "take measures as may be necessary to prevent the spread" of reportable disease. The Governor's office issued press releases the same day, and again on August 28, 2020, describing this guidance; Plaintiff references those releases only as context for the orders issued the same days — the releases themselves are not Relevant Governmental Orders.

29. On August 28, 2020, the Acting State Public Health Officer issued the order titled "California's Plan for Reducing COVID-19 and Adjusting Permitted Sector Activities to Keep Californians Healthy and Safe

29. " (the Blueprint for a Safer Economy), effective August 31, 2020, and issued under Health and Safety Code §§ 131080 and 120175. The Blueprint assigned each county a tier based on disease burden and conditioned each sector's permitted activities on the county's tier. From the Blueprint's effective date through the end of the third quarter of 2020, Fresno County was assigned the most restrictive Purple (widespread) tier, moving to Red (substantial) at the September 29, 2020 assessment, and San Diego County was assigned the Red (substantial) tier — subjecting both counties, and Plaintiff's facilities in them, to heightened restrictions through the close of the

Formatted: Font: 12 pt
Formatted: Header, Line spacing: single
Deleted: Newsom
Formatted: Font color: Auto
Deleted: issue
Deleted: .
Formatted: Font color: Auto
Deleted: Three days later, on
Formatted: Font color: Auto
Formatted: Font color: Auto
Deleted: , but with extensive modifications. ¶
Also on May 7, 2020, Governor Newsom released updated business reopening modifications. *See* Press Release: *Governor Newsom Releases Updated Industry Guidance* (May 7, 2020). These modifications required businesses to (pursuant to Executive Order N-25-20): (a) perform a detailed risk assessment and implement a site-specific protection plan; train employees on how to limit the spread of COVID-19, including how to screen
Formatted: Font color: Auto
Deleted: for symptoms and stay home if they have them; (b) implement individual control measures and screenings; implement disinfecting protocols; and (c) implement physical distancing guidelines.
Deleted: Governor Newsom introduced the Blueprint for a Safer Economy, a comprehensive, county-by-county tier-system to control virus spread through policy restrictions, based on county-specific COVID-19 test positivity and case rates. *See* Press Release: *Governor Newsom Unveils Blueprint for a Safer Economy, a Statewide, Stringent and Slow Plan for Living with COVID-19* (Aug. 28, 2020). CDPH issued its interpretive order (referring to the framework as California's
Deleted: Health
Moved down [1]: . Code Regs.
Deleted: § 3205 (archived).¶
Among other things, the Emergency Temporary Standards to Protect Workers from COVID-19, mandated that employers—at their own expense—do all of the following:¶
Test all employees who were in close contact with an individual with COVID-19;¶
Notify all employees who had close contact with an ... [45]
Deleted: policies to prevent the transmission of COV ... [46]
Deleted: a regional stay-at-home order, which took e ... [47]
Formatted: Font color: Auto
Deleted: associated with the operation, maintenance, ... [48]
Deleted: Tier, which again put Plaintiff under extrem ... [49]
Deleted: , thus reducing its overall capacity to delive ... [50]
Formatted: Centered
Formatted: Font: 11 pt

quarter.

**The Fresno County Orders**

30. On March 27, 2020, the Fresno County Interim Health Officer issued an order requiring that all employers in the county "[o]n a daily basis, while conducting business, screen all employees for febrile respiratory illness," exclude from work all employees reporting symptoms for seven days, direct excluded employees to isolate at home, and direct close contacts to quarantine for fourteen days. The order, issued under Cal. Health and Safety Code § 120175 and recited that violation "is subject to fine, imprisonments or both."

31. On July 23, 2020, inside the third quarter, the Health Officer issued an Amended Order, superseding by its own recital the county's prior orders of March 27, April 14, and May 18, 2020, and requiring all employers in the county to: screen all employees daily for COVID-19 symptoms; exclude symptomatic employees from work for ten days and until 24 hours of symptom and fever improvement; direct excluded employees to isolate at home; and direct close contacts of confirmed cases to a fourteen-day quarantine. Any modification of these requirements required Health Officer approval, and a business that did not believe it could comply with mandated state guidelines was required to submit an alternate plan to the Fresno County Department of Public Health. The order further required every business operating in the county to follow applicable State guidance, and issued under Health and Safety Code § 120175 with the recital that violation is subject to fine, imprisonment, or both.

***The San Diego County Orders***

32. Each San Diego County order pleaded below issued under Health and Safety Code § 120175 (among other authorities recited on its face), recited that violation "is subject to fine, imprisonment, or both," provided that it "may be enforced by the Sheriff or chiefs of police," and

Formatted: Font: 12 pt
Formatted: Header, Line spacing: single
Deleted: *Relevant*
Deleted: *Governmental*
Formatted: Font: Bold
Formatted: Font: Bold
Formatted: Centered, Don't keep with next
Deleted: 26
Deleted: ordered
Deleted: operating
Deleted: :¶
Screen all employees for febrile respiratory illness
Deleted: (on days
Deleted: );¶
Exclude from work all employees that report symptoms of febrile respiratory illnesses for seven (7) days they are identified as having symptoms; ¶
Direct employees excluded from work to isolate at home; and¶
Direct employees to notify anyone who came in close contact with them to quarantine from fourteen (14) days following last known contact.¶
On July 23, 2020, the Health Officer amended the county health order, including additional requirements for business and residents. The order required businesses to follow state guidelines for ensuring the safety of workers and customers, and if a business did not believe it could meet the mandated state guidelines to contact the Fresno County Department of Public Health with an alternate plan to meet the health and safety guidelines. Additionally, employers were required to exclude any employee who exhibited febrile respiratory illness from the premises for ten days from the date the employee is identified as being symptomatic. Furthermore, all employees were required to wear a mask while indoors. ¶
On December 22, 2020, the Health Officer issued an order continuing to require businesses to follow state guidelines for ensuring the safety of workers and customers. Additionally, all employers were required
Deleted: fever,
Deleted: and other COVID-19 symptoms,
Deleted: on Isolation or Quarantine
Deleted: at least ten
Deleted: for those with symptoms and ten days from ... [51]
Deleted: with
Deleted: contact to a person with COVID-19 were
Deleted: be excluded for ten days from the last know ... [52]
Deleted: , along with the others discussed herein, mo ... [53]
Deleted: <#>On February 22, 2021, the Health Offic ... [54]
Formatted: Centered
Formatted: Font: 11 pt

— through its accompanying Emergency Regulations — invoked California Government Code § 8665; the operative July 1, 2020 order additionally invokes Health and Safety Code § 120295 as its own enforcement mechanism. Throughout the quarter, the County's standing Isolation and Quarantine orders separately mandated isolation of persons with or likely to have COVID-19 and quarantine of exposed persons.

33. By order effective March 29, 2020, the County's Health Officer directed all businesses to enact social distancing, increase sanitation standards, and "make every effort" to use telecommuting for their workforces.

34. By addendum dated April 2, 2020, every business remaining in operation was required to prepare and post a "Social Distancing and Sanitation Protocol" on the County's form and to provide evidence of its implementation on demand; facilities not following the protocols would be closed. The County form's mandatory section B directed that "[e]veryone who can carry out their work duties from home has been directed to do so" and that "[a]ll desks or individual work stations are separated by at least six feet." The order effective April 9, 2020 continued the posted-protocol requirement and mandated isolation protocols for persons with or likely to have COVID-19.

35. On May 5, 2020, the County adopted the "Reopen San Diego: Business Safety Framework," which required every business to develop a Safe Reopening Plan implementing specified guidelines before reopening — including maximizing telework opportunities; requiring sick employees to stay home; temperature screening with no entry at 100 degrees or more; maintaining six feet of physical distancing; and "[e]stablishing and enforcing a reduced maximum occupancy that allows for appropriate physical distancing." The order effective May 8, 2020 required all reopened businesses to prepare and post an SRP for each facility, and the order

Formatted ... [55]
Formatted ... [56]
Formatted ... [59]
Deleted: increased
Formatted ... [60]
Deleted: telecommunication for its workforce. To co ... [61]
Deleted: On April 2, 2020, the San Diego County He ... [62]
Formatted ... [63]
Deleted: to the Health Officer and Emergency Regul ... [64]
Formatted ... [65]
Deleted: “
Deleted: ” issued by the San Diego Health and Huma ... [67]
Formatted ... [66]
Deleted: . Facilities
Formatted ... [68]
Formatted ... [69]
Deleted: and, as discussed above, potentially subject ... [70]
Deleted: harsher punishment. The addendum also req ... [72]
Formatted ... [71]
Formatted ... [73]
Deleted: to follow isolation protocols. This latter ... [74]
Deleted: San Diego
Deleted: Board of Supervisors voted to adopt
Formatted ... [75]
Formatted ... [76]
Formatted ... [77]
Deleted: , a general outline for local businesses highl ... [78]
Deleted: (“SRP”) that included:¶ ... [80]
Formatted ... [79]
Deleted: ¶ ... [82]
Formatted ... [81]
Formatted ... [83]
Deleted: ¶ ... [84]
Deleted: temperatures of
Deleted: Fahrenheit
Deleted: was not allowed into the workplace);¶ ... [88]
Formatted ... [85]
Formatted ... [86]
Formatted ... [87]
Deleted: ¶ ... [90]
Formatted ... [89]
Formatted ... [91]
Deleted: ;¶ ... [92]
Deleted: , also
Formatted ... [93]
Formatted ... [94]
Deleted: have
Formatted ... [95]
Deleted: .¶ ... [96]
Formatted ... [58]
Formatted ... [57]

effective May 26, 2020 required incorporation of the State's mandatory industry guidance into the SRP and defined "social distancing" as "maintaining six-foot separation from all persons except for household members, first responders, and medical providers or employees conducting temperature screenings."

36. By the Order of the Health Officer and Emergency Regulations effective July 1, 2020 (lodged in this action as ECF 28-1), § 16(b) commanded that each essential and reopened business "[s]hall conduct temperature screening of all employees and prohibit entry to the workplace of employees with a temperature of 100 degrees or more," and that employees exhibiting COVID-19 symptoms as described by the CDC, or recently exposed to a person who tested positive, "must also be denied entry into the workplace." The order provided that any business may remain open only to the extent its employees and owners can provide its services from home by telecommuting, or under the posted-protocol regime; it invoked Health and Safety Code § 120295 as its enforcement mechanism, was enforceable by the Sheriff or chiefs of police, and subjected violations to fine, imprisonment, or both.

37. The Health Officer carried the § 16(b) screening and denial-of-entry commands forward in superseding orders effective July 7, July 15, July 21, July 30, and August 8, 2020; the July 30 order added employer duties to notify the County of employee COVID-19 diagnoses, and the August 8 order added exposure-notice duties per the State's COVID-19 Employer Playbook. The order effective August 22, 2020 continued the same command phrased as "[r]equire temperature screening . . . and prohibit entry."

38. On September 1, 2020 — inside the third quarter — the Health Officer issued a restructured Order of the Health Officer and Emergency Regulations. The September 1 order required every essential business to prepare, post at each facility, provide to each employee,

Formatted ... [97]
Formatted ... [98]
Deleted: , the San Diego County Public Health Offi ... [102]
Deleted: all businesses to include all
Deleted: guidelines issued by California
Deleted: their Safe Reopening Plan. Additionally, al ... [106]
Formatted ... [101]
Formatted ... [103]
Formatted ... [104]
Formatted ... [105]
Deleted: , and facial coverings. This order defined " ... [108]
Deleted: "
Formatted ... [107]
Formatted ... [109]
Formatted ... [110]
Deleted: ."
Formatted ... [111]
Deleted: ,
Formatted ... [112]
Formatted ... [113]
Deleted: , included the same requirements for employers
Deleted: the May 8, 2020, order but also stated
Deleted: in addition to prohibiting
Formatted ... [114]
Formatted ... [115]
Deleted: for
Formatted ... [116]
Deleted: ,
Formatted ... [117]
Formatted ... [118]
Deleted: Center for Disease Control and Prevention
Deleted: employees who had
Deleted: been
Formatted ... [119]
Formatted ... [120]
Formatted ... [121]
Deleted: has
Deleted: for COVID-19
Deleted: .¶ ... [124]
Formatted ... [122]
Formatted ... [123]
Deleted: Health Officer and Emergency Regulation ... [126]
Formatted ... [125]
Deleted: <#>Promptly notify the County Depa ... [127]
Formatted ... [100]
Formatted ... [99]

implement, and prove implementation on demand of its "Social Distancing and Sanitation Protocol," and every reopened business the same as to its "Safe Reopening Plan," and commanded: "Any business that fails to prepare and comply with its Safe Reopening Plan or COVID-19 Restaurant Operating Protocol shall immediately close." The County's Safe Reopening Plan form (Rev. September 4, 2020), section B, made mandatory that "[a]ll employees must either be screened for symptoms . . . or have their temperature taken," that employees with symptoms or a temperature of 100 degrees or more "should not be allowed in the workplace," and that "[a]ll desks or individual work stations are separated by at least six feet." The order issued under Health and Safety Code § 120175, was enforceable by the Sheriff or chiefs of police, and subjected violations to fine, imprisonment, or both.

39. The Health Officer continued the restructured posted-protocol regime in orders effective September 10 and September 25, 2020, carrying the regime through the close of the third quarter.

40. Plaintiff was subject to each of the orders pleaded in paragraphs 26 through 39 at its Fresno and Carlsbad facilities throughout the third quarter of 2020.

**Plaintiff's Operations in Q3 2020: Discrete Portions of the Business Temporarily Ceased**

41. Because Plaintiff assists customers in finding health and life insurance plans, it was considered an essential business and its call centers continued operating during the third quarter of 2020 — but only in compliance with the Relevant Governmental Orders, with which Plaintiff complied throughout the quarter. The partial suspension pleaded here coexists with that continued overall operation: specific, discrete portions of Plaintiff's business temporarily ceased during the quarter, while the remainder continued.



**Formatted:** Font: 12 pt
**Formatted:** Header, Line spacing: single
**Deleted:** <u>**Were Impacted by The Relevant Governmental Orders**</u>
**Formatted:** Don't keep with next, Tab stops: Not at 1.68"
**Deleted:** its
**Deleted:** allowed to continue operating both its Fresno and San Diego County locations during the pandemic. However, it was only permitted to operate in compliance with the strict, ever-changing restrictions imposed by the state and relevant county governments.
**Formatted:** Centered
**Formatted:** Font: 11 pt

***In-Person Production Call Handling at Fixed Workstations — The Idled Sections of the Call Floors***

42. Plaintiff's production floors were fixed-footprint, built-to-purpose facilities. At the Fresno floor, the cubicles were built-in, hard-walled workstations — half-height "pony wall" partitions fixed to the floor, wired for power, networked telephony, and commercial high-speed internet at fixed positions — arranged in rows separated by aisles approximately two to three feet wide, close enough that an agent pushing a chair back from one station would strike the row behind it. Every station on the main floor faced forward, toward the supervisor's desk at the front of the room. At the Carlsbad floor, workstations ran along the perimeter walls with additional stations in the center of the room.

43. Before the orders, the Fresno call floor comprised approximately 20 built-in workstations. Hand-drawn floor plans of the Fresno floor prepared by Plaintiff's owner, and photographs of the floor, are attached as Exhibits B and C and incorporated by reference. The Carlsbad floor was smaller, with fewer workstations.

44. The six-foot separation the orders commanded — the May 26, 2020 order's definition of social distancing, the mandatory posted-protocol forms' "[a]ll desks or individual work stations are separated by at least six feet," the Reopen San Diego Framework's reduced-maximum-occupancy element, and the State guidance every Fresno County business was ordered to follow — fixed the number of workstations that could lawfully be occupied on each floor. On the Fresno main floor, the built-in stations were grouped in blocks of nine; at the commanded separation, only five of each nine could be occupied at one time.

45. In response, and to comply, Plaintiff took the remaining workstations out of service. The idled stations stood vacant continuously from the orders' operative dates through the close of



Formatted: Font: 12 pt

Formatted: Header, Line spacing: single

Deleted: <#>Said another way, beginning in March 2020 and continuing well beyond June 2021, Plaintiff was forced to comply with the requirements of the Relevant Governmental Orders, which more than nominally impacted its business operations, creating a suspension of those operations.¶

Formatted: Centered

Formatted: Font: 11 pt

the third quarter of 2020 and beyond. Displaced agents were relocated to improvised positions in spaces not built for call handling — administrative offices whose occupants surrendered them, open circulation areas, and makeshift desks assembled in the center of the building. Plaintiff's contemporaneous purchase records corroborate the commanded reconfiguration: beginning July 21, 2020 and continuing through the fall, Plaintiff purchased computer desks, chairs, and ethernet cabling to outfit the improvised positions, and beginning September 10, 2020, Plaintiff purchased plastic cubicle dividers from a commercial fabricator to partition the stations remaining in service.

46. The idled sections were not a diffuse loss of efficiency; they were identifiable, physical sections of a fixed-footprint operation that the orders foreclosed Plaintiff from using at all. In 2019, those stations had been staffed and productive as part of a floor whose output depended on proximity itself.

***In-Person New-Agent Training and Onboarding***

47. Before March 2020, Plaintiff trained and onboarded new agents in person at its facilities: a new agent shared a single workstation with the training agent, side by side, listening to live calls and being corrected in real time.

48. The orders' six-foot separation, screening, and posted-protocol commands foreclosed that shared-station format: in-person training and onboarding ceased, was not reconstituted remotely during the quarter, and Plaintiff onboarded no new agents during the period.

***Live Floor Supervision and Side-by-Side Coaching***

49. Before the orders, Plaintiff's agents and supervisors worked in immediate physical proximity on the call floors. Every station on the Fresno main floor faced forward, so a supervisor standing at the front of the room could address the entire floor at once and walk the aisles coaching agents on live calls; agents heard one another's calls and learned call openings and objection-



**Formatted:** Font: 12 pt
**Formatted:** Header, Line spacing: single
**Formatted:** Centered
**Formatted:** Font: 11 pt

Formatted: Font: 12 pt
Formatted: Header, Line spacing: single

handling from the stronger agents beside them. The business was built on that proximity.

50. The commanded workstation separation and the exclusion of workers made that supervision model impossible to perform: stations were scattered and faced in different directions, walk-the-floor coaching could not be conducted at the commanded distance, and supervision migrated to electronic messages. Live floor supervision and side-by-side coaching ceased for the duration of the quarter, and could not be performed at all for agents working remotely.

***On-Site Customer-Service Call Handling***

51. Before the orders, Plaintiff's customer-service representatives — who handled service calls from existing policyholders — worked on-site at Plaintiff's facilities. To free lawful floor capacity for production agents under the commanded separation, Plaintiff removed the customer-service function from its facilities and directed those employees to work from home; their calls connected through the same hosted platform with degraded quality off-site. On-site customer-service call handling ceased for the duration of the quarter.

***The Order-Commanded Exclusion of Workers — Per-Worker Cessation***

52. Throughout the quarter, the Fresno County orders and the San Diego County orders pleaded above commanded Plaintiff, under threat of fine and imprisonment, to screen every employee every workday and to deny entry to — exclude — every employee with a qualifying temperature, symptoms, or recent exposure, for exclusion periods running seven to fourteen days per occurrence.

53. Plaintiff complied: employees were screened at the door each workday and employees who reported symptoms, screened out, or had been exposed were excluded from the workplace for the commanded periods, in exclusion periods of one to two weeks per occurrence. Plaintiff's records reflect 27 employees excluded for COVID-19-related absences during the

Formatted: Centered
Formatted: Font: 11 pt

periods the orders were in effect, missing a combined 1,920 hours of work — 21 employees excluded for 80 hours each and six for 40 hours each — for which Plaintiff maintained pay totaling $31,790.

54. Plaintiff's contemporaneous expense records reflect the exclusion commands in operation during the quarter: on July 24, 2020, Plaintiff paid for COVID-19 testing for three employees screened out of the workplace ($270 each); on July 31, 2020, for two more ($235 each); and on September 11, 2020, for another ($270) — six paid tests within the third quarter of 2020, each reflecting an employee denied entry under the screening commands. Plaintiff also paid for after-hours janitorial disinfection during the quarter (July 27, 2020, $250).

***Remote Work Did Not Restore the Ceased Portions***

55. At the behest of the Relevant Governmental Orders, Plaintiff transitioned a small portion of its workforce to remote work, incurring significant costs to provide those employees expensive and complex equipment.

56. Remote work allowed continuation of some sales activity, but it did not restore the ceased portions of the business identified above: (a) the idled workstation sections remained idle — a remote agent did not reopen a lawfully unoccupiable station; (b) live floor supervision and side-by-side coaching cannot be performed on a floor that is not staffed, and could not be performed for remote agents (c) remote connections degraded the production function itself: calls routed through Plaintiff's VoIP platform to off-floor and at-home agents connected with a delay, call quality worsened with distance from the system, and every completed application required live transfers among three to four employees — fronter to agent to verifier — with each off-site transfer adding a failure point at which calls were dropping frequently. At-home agents received fewer calls than agents on the floor and asked to return to the facility.



Formatted: Font: 12 pt

Formatted: Header, Line spacing: single

Deleted: its workforce in-person to the extent it was able. However, to remain open under the

Formatted: Centered

Formatted: Font: 11 pt

57. Plaintiff's remote cohort comprised a small portion of its workforce, including the relocated customer-service employees.

**Causation: The Ceased Portions Were Commanded, Not Chosen**

58. Each cessation pleaded above was factually and proximately caused by the Relevant Governmental Orders; the workstation sections stood idle because the orders' six-foot separation and posted-protocol commands made staffing them unlawful; the excluded employees' functions ceased because the orders commanded, through the word "shall," that they be denied entry; and the in-person activities ceased because the orders' distancing, screening, and protocol commands foreclosed them. The seats stood empty because the orders made filling them unlawful — not because customers stayed away or demand declined.

59. Plaintiff's compliance was not voluntary. Violation of the county orders was, on the face of each order, subject to fine, imprisonment, or both, enforceable in San Diego County by the Sheriff or chiefs of police; from September 1, 2020, a San Diego County business that failed to prepare and comply with its posted protocol was ordered to "immediately close"; and the Fresno County orders permitted deviation only through a Health Officer–approved alternate plan.

60. The repercussions for noncompliance were not theoretical. Independent of the orders' own penalty recitals, every California employer was required throughout the quarter, by Labor Code § 6400 and title 8, §3203 of the California Code of Regulations, to maintain and implement a written Injury and Illness Prevention Program addressing workplace hazards, including COVID-19 — a duty enforceable through mandatory citations, Lab. Code § 6317, civil penalties of up to $25,000 per serious violation, Lab. Code § 6428, and criminal liability, Lab. Code § 6423. During the third quarter of 2020 itself, California cited employers six-figure COVID-19 penalties — including citations of $222,075 and $214,080 announced September 9, 2020 —



Formatted: Font: 12 pt

Formatted: Header, Line spacing: single

Deleted: , Plaintiff had to test each of its employees prior to their shifts. If an employee tested positive, the

Formatted: Centered

Formatted: Font: 11 pt

for workplace-safety failures that included the absence of physical distancing and barriers between workers. *See* Cal. Dep't of Indus. Relations, News Release Nos. 2020-76 (Sept. 4, 2020) and 2020-78 (Sept. 9, 2020).

**The Ceased Portions Were More Than Nominal**

61. Collectively and individually, the ceased operations pleaded above — the idled workstation sections; the ceased in-person training, supervision, and on-site customer-service activities; and the exclusion of individual workers who had COVID-19 or exhibited COVID-19 symptoms — constituted identifiable operational components of Plaintiff's business that historically performed substantial production functions within it.

62. Demand for Plaintiff's services remained strong throughout the quarter; the cessations pleaded here are cessations of Plaintiff's capacity to serve that demand, not a decline in output or receipts. Plaintiff does not invoke the gross-receipts basis for eligibility.

63. During the quarter, the federal Emergency Paid Sick Leave Act (April 1 – December 31, 2020) also required Plaintiff to provide paid sick leave to qualifying employees. Plaintiff pleads this as context for staffing conditions; Plaintiff's partial-suspension claim does not rest on the federal statute.

64. Accordingly, the Relevant Governmental Orders factually and proximately caused Plaintiff to temporarily cease performing distinct, more-than-nominal portions of its business during the third quarter of 2020, effecting a partial suspension of Plaintiff's business operations within the meaning of 26 U.S.C. § 3134(c)(2)(A)(ii)(I) and § 2301 of the CARES Act.

**Subsequent Periods**

65. After the close of the third quarter of 2020, the Relevant Governmental Orders continued and evolved. The San Diego County order effective October 10, 2020 carried the posted-

Formatted: Centered
Formatted: Font: 11 pt

Formatted: Font: 12 pt

Formatted: Header, Line spacing: single

protocol regime forward; the Fresno County Health Officer issued amended orders on December 22, 2020 and February 22, 2021 continuing the daily-screening and exclusion architecture, the latter running by its own terms "until terminated, superseded, or amended," with no county successor or termination instrument issued.

66. On November 20, 2020, the California Occupational Safety and Health Standards Board adopted COVID-19 Emergency Temporary Standards under Labor Code § 142.3, effective November 30, 2020. 8 Cal. Code Regs. § 3205. As adopted, the standard required of nearly every California employer a written COVID-19 Prevention Program (§ 3205(c)); commanded that "[a]ll employees shall be separated from other persons by at least six feet," with compliance methods including "reducing the number of persons in an area at one time" (§ 3205(c)(6)); required cleanable solid partitions at fixed work locations where the distancing requirement could not be maintained (§ 3205(c)(8)); and mandated the exclusion of COVID-19 cases and exposed employees from the workplace (§ 3205(c)(10)), with excluded employees' earnings and benefits maintained (§ 3205(c)(10)(C)). The standard was readopted effective June 17, 2021 with no gap in coverage. The ETS was enforceable like any Cal/OSHA standard: citations were mandatory upon violation (Lab. Code § 6317); civil penalties ran to $25,000 per serious violation (§ 6428) and to six figures per willful or repeated violation (§ 6429); failure to abate accrued penalties of up to $15,000 per day (§ 6430); and serious violations carried criminal exposure (§§ 6423, 6425). From January 1, 2021, the Division of Occupational Safety and Health additionally held express statutory authority to prohibit any operation or process at — or entry into — any place of employment exposing workers to a risk of COVID-19 infection constituting an imminent hazard (former Lab. Code § 6325(b), added by Assem. Bill 685, Stats. 2020, ch. 84, operative Jan. 1, 2021), and COVID-19 serious-violation citations were exempt from pre-citation notice

Moved (insertion) [1]

Deleted: required that employee to isolate and not work. This isolation requirement, along with the other

Formatted: Centered

Formatted: Font: 11 pt

requirements (§ 6432(h)).

67. On December 3, 2020, the Acting State Public Health Officer issued the Regional Stay at Home Order; the San Joaquin Valley and Southern California regions were closed under it from December 7, 2020 to January 24, 2021, and both counties returned to the Purple tier. The San Diego County order effective December 10, 2020 incorporated the Regional Stay at Home Order.

68. From January 1, 2021, California SB-95 required employers with more than 25 employees to provide supplemental paid sick leave through September 30, 2021.

69. On June 11, 2021, Executive Order N-07-21 rescinded Executive Orders N-33-20 and N-60-20 and terminated the State Public Health Officer's orders effective June 15, 2021, while leaving local health authority in place; the San Diego County order effective May 6, 2021 continued the essential-business requirements, and the County's Limited Order effective June 15, 2021 continued mandatory isolation (December 24, 2020 order) and quarantine (April 5, 2021 order) beyond the third quarter of 2021.

70. Plaintiff complied with the requirements of the Relevant Governmental Orders applicable to it through the employment tax quarter ended June 30, 2021.

THE 941-X FILINGS AND PAYMENT STATUS

71. As a result of the partial suspension of its business operations, Plaintiff filed Forms 941-X claiming entitlement to ERCs based on qualified wages as follows:

| Quarter Ended | Qualified Wages | ERC (Excluding Interest) |
|---|---|---|
| June 30, 2020 | $247,906.43 | $123,953.22 |
| September 30, 2020 | $101,073.49 | $50,536.74 |
| December 31, 2020 | $270,013.74 | $124,881.35 |
| March 31, 2021 | $484,456.76 | $339,119.73 |
| June 30, 2021 | $478,924.81 | $335,247.37 |
| Total ERC Claimed (Excluding Interest) | | $973,738.41 |

72. When calculating its ERC, Plaintiff did not take into account qualified wages paid



**Formatted:** Font: 12 pt

**Formatted:** Header, Line spacing: single

**Deleted:** discussed herein, restricted Plaintiff's ability to maintain adequate staffing at its facilities

**Deleted:** was also forced to increase the distance between its call center employees' workstations to comply

**Deleted:** social distancing mandates, thus reducing its capacity significantly. ¶
Plaintiff was able to transition a small portion of its workforce to remote work, at the behest

**Deleted:** . Plaintiff incurred significant costs in for these few employees, including providing those employees expensive and complex equipment so they could efficiently complete their work. Additionally, while the employees were transitioned to remote work, Plaintiff's operations were negatively impacted by the lower quality of internet available to its newly remote workers, which reduced the capacity of the remote workers and in turn reduced the efficiency and production capacity of Plaintiff overall. ¶
Additionally, Plaintiff expended significant resources to provide employees sanitization supplies and masks to those employees who continued working onsite.¶
Plaintiff experienced a decrease in the operational capacity as a result of the Relevant Governmental Orders because its employees took longer to complete tasks, Plaintiff had to limit the number of employees in its facilities, and Plaintiff's remote workforce could not maintain the same operational efficiency as

**Formatted:** Font color: Auto

**Formatted:** Font color: Auto

**Deleted:** did in person prior to the pandemic. This decrease in capacity had a more than nominal impact on Plaintiff's business operations, creating a partial suspension of those operations. ¶
Plaintiff's operational capacity was further reduced because of the increase in paid sick leave. From April 1, 2020, to December 31, 2020, the Families First Coronavirus Response Act ("FFCRA") required employers with less than 500 employees provide Emergency Paid Sick Leave if their employees had COVID-19 symptoms, cared for a quarantined individual or child affected by school closures, or needed time to get tested or receive vaccinations. *See* H.R. 6201, Pub. L. 116-127 (Mar. 18, 2020). Under California SB-95, from January 1, 2021, to September

**Deleted:** , employers with more than twenty-six employees had to provide up to 80 hours of supplemental paid sick leave for the same circumstances as the FFCRA. These statutes directly resulted in an increase in the amoun ... [128]

**Deleted:** <#>Accordingly, these facts and circumstances show that the Relevant Governmental Orders had a more than nominal impact on Plaintiff's business operatio ... [129]

**Formatted:** Not Highlight

**Deleted:** 2,295,036.82

**Formatted:** Centered

**Formatted:** Font: 11 pt

to any individuals who directly or indirectly owned a majority interest in Plaintiff, or to any relatives of those individuals; and while Plaintiff applied for and had forgiven a first-draw Paycheck Protection Program loan, it did not take into account wages covered by the forgiven PPP loan in calculating qualified wages.

73. Prior to Plaintiff filing this suit, the IRS issued to Plaintiff overpayments for the quarters ended June 30, 2020, December 31, 2020, and March 31, 2021.

74. After Plaintiff initiated this suit, the IRS issued Plaintiff an overpayment for the quarter ended June 30, 2021.

75. On or about September 1, 2025 — after Plaintiff initiated this suit — the IRS issued Plaintiff a Notice CP210 for the tax period ended September 30, 2020, stating changes to Plaintiff's September 30, 2020 Form 941 and an overpayment of $50,536.74. A true and correct copy of the Notice CP210 is attached as Exhibit D.

76. Notwithstanding the September 1, 2025 notice, as of this filing Plaintiff has not received payment of the overpayment stated for the quarter ended September 30, 2020.

77. The September 1, 2025 notice was addressed to offices Plaintiff's counsel no longer maintained.

**COUNT I: PLAINTIFF IS ENTITLED TO A REFUND FOR Q3 2020**

78. On or before October 21, 2020, Plaintiff filed an original Form 941 for the employment tax quarter ended September 30, 2020.

79. Plaintiff paid qualifying wages of $101,073.49 in Q3 2020 and calculated an ERC of $50,536.74 for the quarter.

80. On or about January 18, 2023, Plaintiff filed a Form 941-X for Q3 2020, claiming a refund of tax and ERC in the amount of $50,536.74, with the IRS Service Center in Ogden, Utah.

**Formatted:** Font: 12 pt

**Formatted:** Header, Line spacing: single

**Deleted:** qualified wages paid

**Deleted:** .

**Deleted:** <#>While Plaintiff applied for and had forgiven loans under the first draw of the Paycheck Protection Program ("PPP"), Plaintiff did not take into account wages covered by forgiven PPP loans in calculating its qualified wages for the ERC.¶

**Deleted:** <#>As of Plaintiff's initial filing, the IRS had failed to issue Plaintiff overpayments for the quarters ended September 30, 2020, and June 30, 2021.¶

**Deleted:** As

**Deleted:** ,

**Deleted:** an

**Deleted:** 31

**Deleted:** ("Q3 2020").

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Not Expanded by / Condensed by

**Formatted:** Centered

**Formatted:** Font: 11 pt

A true and correct copy of the Form 941-X for Q3 2020 is attached as Exhibit E.

81. Plaintiff is a qualified employer eligible for an ERC for Q3 2020 under the Full or Partial Suspension Test because it paid qualified wages to employees during the quarter and because the Relevant Governmental Orders — qualifying governmental orders carrying enforcement authority on their face — factually and proximately caused Plaintiff to temporarily cease performing distinct, more-than-nominal portions of its business operations during the quarter, as alleged in paragraphs 41 through 64, effecting a partial suspension of Plaintiff's business operations.

82. Plaintiff timely filed its Q3 2020 refund claim on Form 941-X within three years of filing its original Form 941 for this period.

83. More than six months have elapsed since Plaintiff filed its Q3 2020 refund claim with the IRS, and the IRS has not disallowed Plaintiff's claim.

84. Thus, Plaintiff is entitled to a refund of $50,536.74 plus interest for Q3 2020.

WHEREFORE, Plaintiff prays that this Honorable Court:

A. Award judgment in favor of Plaintiff and against the United States for:

i. $50,536.74 plus interest for Plaintiff's Form 941 taxes/ERC credit for the employment tax quarter ended September 30, 2020; and

ii. Any other interest, costs, and attorney's fees.

B. Grant any further relief this Court may find just and proper.

Formatted: Font: 12 pt
Formatted: Header, Line spacing: single
Deleted: Attached as **Exhibit B** is a
Deleted: Plaintiff's filed
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Deleted: had a
Deleted:
Deleted:
Deleted: impact on Plaintiff's operations, leading to
Deleted: its
Deleted: the
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Formatted: Not Expanded by / Condensed by
Deleted: or otherwise adjudicated Plaintiff's
Deleted:
Formatted: Centered
Formatted: Font: 11 pt

Dated: August 6, 2026. Respectfully submitted,

/s/ Samuel D. Brotman
SAMUEL D. BROTMAN
CA Bar No. 274966
sbrotman@sambrotman.com

TARA NICOLE PULLANO
IL Bar No. 6342966
tpullano@sambrotman.com

/s/ Rojin Kayla Bijan
ROJIN KAYLA BIJAN
CA Bar No. 366992
rbijan@sambrotman.com

BROTMAN LAW
12636 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (619) 378-3138
Fax: (619) 378-3039

*Counsel for Plaintiffs*

Formatted ... [130]
Formatted ... [131]
Deleted: February 2
Deleted: Submitted
Formatted ... [134]
Formatted ... [136]
Formatted ... [137]
Formatted ... [135]
Deleted: *Christina Tallulah Lanier* ... [139]
Deleted: C.
Formatted ... [138]
Formatted ... [140]
Formatted ... [141]
Deleted: 1779680
Formatted ... [143]
Formatted ... [144]
Formatted ... [142]
Deleted: ¶ ... [145]
Formatted ... [146]
Formatted ... [147]
Deleted: 12363
Formatted ... [148]
Deleted: Main Office
Formatted ... [149]
Deleted: Facsimile
Formatted ... [150]
Deleted: Email: tlanier@sambrotman.com¶

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2026, the foregoing was filed electronically through the Court's CM/ECF system, which will serve a copy on all counsel of record.

/s/ Rojin Kayla Bijan

ROJIN KAYLA BIJAN

Deleted: CONFERRAL
Formatted ... [151]
Formatted ... [153]
Formatted ... [152]
Deleted: I certify that prior to filing this amended ... [154]
Deleted: *Christina Tallulah Lanier*
Formatted ... [155]
Formatted ... [157]
Formatted ... [156]
Deleted: CHRISTINA TALLULAH ... [158]
Deleted: Law¶ ... [161]
Formatted ... [159]
Formatted ... [162]
Formatted ... [160]
Formatted ... [133]
Formatted ... [132]

| Page 1: [1] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Endnote Text

| Page 1: [2] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Table Paragraph

| Page 1: [3] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Comment Text: Font: (Default) Times New Roman, Space After: 10 pt, Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

| Page 1: [4] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Footnote Text

| Page 1: [5] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Revision: Font: (Default) Times New Roman, 12 pt

| Page 1: [6] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Default

| Page 1: [7] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Body Text: Font: (Default) Times New Roman, 12 pt, Space After: 6 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

| Page 1: [8] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

List Paragraph: Font: 12 pt, Indent: Left: 0.5", First line: 0", Space After: 10 pt, Don't add space between paragraphs of the same style, Line spacing: Multiple 1.15 li, Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space be

| Page 1: [9] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Footer: Font: (Default) Times New Roman, 12 pt, Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

| Page 1: [10] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Header: Font: (Default) Times New Roman, 12 pt, Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

| Page 1: [11] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 9: Font: (Default) +Headings (Calibri), 10 pt, Italic, Font color: Text 1, Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian text, Adjust space be

| Page 1: [12] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 8: Font: (Default) +Headings (Calibri), 10 pt, Font color: Accent 1, Indent: Left: 0", Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian text, Ad

| Page 1: [13] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 7: Font: (Default) +Headings (Calibri), 12 pt, Italic, Font color: Text 1, Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian text, Adjust space be

| Page 1: [14] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 6: Font: (Default) +Headings (Calibri), 12 pt, Italic, Font color: Accent 1, Indent: Left: 0", Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian

| Page 1: [15] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 5: Font: (Default) +Headings (Calibri), 12 pt, Font color: Accent 1, Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian text, Adjust space between

| Page 1: [16] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 4: Font: (Default) +Headings (Calibri), 12 pt, Bold, Italic, Font color: Accent 1, Indent: Left: 0", Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and

| Page 1: [17] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 3: Font: (Default) +Headings (Calibri), 12 pt, Bold, Font color: Accent 1, Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian text, Adjust space be

| Page 1: [18] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 2: Font: (Default) +Headings (Calibri), 13 pt, Bold, Font color: Accent 1, Space Before: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian text, Adjust space be

| Page 1: [19] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Heading 1: Font: (Default) +Headings (Calibri), 14 pt, Font color: Accent 1, Left, Right: 0", Space Before: 24 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Keep with next, Keep lines together, Adjust space between Latin and Asian text, Adj

| Page 1: [20] Style Definition | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Normal: Font: (Default) Times New Roman, 12 pt, Space After: 10 pt, Line spacing: Multiple 1.15 li, Widow/Orphan control, Adjust space between Latin and Asian text, Adjust space between Asian text and numbers

| Page 1: [21] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Space Before: 0 pt, After: 0 pt, Line spacing: 1.5 lines

| Page 1: [22] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Header distance from edge: 0.5"

| Page 1: [23] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [24] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [25] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [26] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [27] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [28] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [29] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [30] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Line spacing: 1.5 lines

| Page 1: [31] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Space Before: 0 pt, Don't keep with next

| **Page 1: [32] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

No underline, Underline color: Auto, Not Expanded by / Condensed by

| **Page 1: [33] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Don't keep with next

| **Page 1: [34] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [35] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [36] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [37] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

No underline, Underline color: Auto

| **Page 1: [38] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [39] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [40] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [41] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

1.

| **Page 1: [42] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [43] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Not Expanded by / Condensed by

| **Page 1: [44] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

No underline, Underline color: Auto

| **Page 7: [45] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

2.

| **Page 7: [46] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

3.

| **Page 7: [47] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

4.

| **Page 7: [48] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

5.

| **Page 7: [49] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

6.

| **Page 7: [50] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

7.

| **Page 8: [51] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

8.

| **Page 8: [52] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

9.

| Page 8: [53] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

10.

| Page 8: [54] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

11.

| Page 1: [55] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font: 12 pt

| Page 1: [56] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Header, Line spacing: single

| Page 1: [57] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font: 11 pt

| Page 1: [58] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Centered

| Page 9: [59] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [60] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [61] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

12.

| Page 9: [62] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

13.

| Page 9: [63] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [64] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

14.

| Page 9: [65] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [66] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [67] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

15.

| Page 9: [68] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [69] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [70] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

16.

| Page 9: [71] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [72] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

17.

| Page 9: [73] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [74] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

18.

| Page 9: [75] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [76] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [77] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [78] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

19.

| Page 9: [79] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [80] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

20.

| Page 9: [81] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [82] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

21.

| Page 9: [83] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 9: [84] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

22.

| **Page 9: [85] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [86] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [87] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [88] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

23.

| **Page 9: [89] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [90] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

24.

| **Page 9: [91] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [92] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

25.

| **Page 9: [93] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [94] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [95] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 9: [96] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

26.

| **Page 1: [97] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font: 12 pt

| **Page 1: [98] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Header, Line spacing: single

| **Page 1: [99] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font: 11 pt

| **Page 1: [100] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Centered

| **Page 10: [101] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 10: [102] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

27.

| **Page 10: [103] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 10: [104] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 10: [105] Formatted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

Font color: Auto

| **Page 10: [106] Deleted** | **Rojin Bijan** | **8/6/26 10:33:00 AM** |
|---|---|---|

28.

| Page 10: [107] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [108] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

29.

| Page 10: [109] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [110] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [111] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [112] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [113] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [114] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [115] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [116] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [117] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [118] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [119] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [120] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [121] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [122] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [123] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [124] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

30.

| Page 10: [125] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font color: Auto

| Page 10: [126] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

31.

| Page 10: [127] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

| Page 19: [128] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

32.

| Page 19: [129] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

| Page 1: [130] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font: 12 pt

| Page 1: [131] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Header, Line spacing: single

| Page 1: [132] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font: 11 pt

| Page 1: [133] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Centered

| Page 22: [134] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Not Expanded by / Condensed by

| Page 22: [135] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Left, Space After: 14 pt, Line spacing: single, Don't keep with next

| Page 22: [136] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Not Expanded by / Condensed by

| Page 22: [137] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Not Expanded by / Condensed by

| Page 22: [138] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font: Not Italic, Not Expanded by / Condensed by

| Page 22: [139] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

| Page 22: [140] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font: Italic, Underline, Not Expanded by / Condensed by

| Page 22: [141] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Font: Italic, Underline, Not Expanded by / Condensed by

| Page 22: [142] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Left, Indent: Left: 3.5", Line spacing: single, Don't keep with next

| Page 22: [143] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Not Expanded by / Condensed by

| Page 22: [144] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

Not Expanded by / Condensed by

| Page 22: [145] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
|---|---|---|

**Page 22: [146] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Not Expanded by / Condensed by

**Page 22: [147] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Left, Indent: Left: 3.5", Line spacing: single, Don't keep with next

**Page 22: [148] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Not Expanded by / Condensed by

**Page 22: [149] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Not Expanded by / Condensed by

**Page 22: [150] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Not Expanded by / Condensed by

**Page 22: [151] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

No underline, Not Expanded by / Condensed by

**Page 22: [152] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Space Before: 6 pt, After: 0 pt, Line spacing: single

**Page 22: [153] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Font: Not Bold, No underline, Not Expanded by / Condensed by

**Page 22: [154] Deleted** **Rojin Bijan** **8/6/26 10:33:00 AM**

**Page 22: [155] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Font: Not Italic, Not Expanded by / Condensed by

**Page 22: [156] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Left, Indent: Left: 3.5", Space Before: 6 pt, Line spacing: single, Don't keep with next

**Page 22: [157] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Font: Not Italic, No underline, Not Expanded by / Condensed by

**Page 22: [158] Deleted** **Rojin Bijan** **8/6/26 10:33:00 AM**

**Page 22: [159] Formatted** **Rojin Bijan** **8/6/26 10:33:00 AM**

Font: Italic, Underline, Not Expanded by / Condensed by

| Page 22: [160] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
| --- | --- | --- |

Space Before: 0 pt, After: 0 pt, Line spacing: single

| Page 22: [161] Deleted | Rojin Bijan | 8/6/26 10:33:00 AM |
| --- | --- | --- |

| Page 22: [162] Formatted | Rojin Bijan | 8/6/26 10:33:00 AM |
| --- | --- | --- |

Not Expanded by / Condensed by